## CLARIDGE v. KULMER and others.

*(Circuit Court, E. D. Pennsylvania. March 9, 1880.)*

BANKRUPTCY—PREFERENCE—REASONABLE CAUSE TO BELIEVE.—A preference may be avoided under the bankrupt law wherever the creditor has knowledge of facts calculated not merely to raise a suspicion, but to produce a reasonable belief of the debtor's insolvency. What facts are necessary to produce such belief must be determined in each particular case.

SAME—SETTING ASIDE EXECUTION—EFFECT ON INTERMEDIATE LIENS.— Where an assignee in bankruptcy avoids, as a preference, an execution larger in amount than the value of the goods levied on, he is entitled to the goods or their proceeds as against an execution levied after the preferential execution, but before the filing of the petition in bankruptcy.

Bill in equity, filed by petitioning creditors of Dempster, an alleged bankrupt, to restrain certain other creditors from proceeding upon executions levied upon the personal property of the bankrupt, the bill alleging that these executions were fraudulent preferences. An injunction was granted, and, after Dempster had been adjudicated a bankrupt, the property was sold under an order of court by commissioners and the proceeds paid into the registry of the court. The asignee in bankruptcy was substituted as complainant, and after the pleadings and evidence had been completed the cause was, by agreement of the parties, referred to the register in bankruptcy, Edwin T. Chase, Esq., as master. He found the following facts:

The petition in bankruptcy was filed May 14, 1878. On May 8, 1878, two executions had been levied upon the bankrupt's personal property; one in favor of Thompson & Binns, upon a judgment confessed April 26, 1878, for $806.20, an the other in favor of Gotlieb Kulmer, upon a judgment confessed April 29, 1878, for $354.81. Between the date of these executions and the filing of the petition several small executions, upon judgments obtained adversely, were levied. Prior to receiving from Dempster the confessions of judgment, Thompson & Binns had from time to time sold merchandise to him for cash, receiving his checks in payment. On the last few purchases the checks came back unpaid and protested. Mr. Thompson, becoming alarmed, went to Chester, where Dempster resided. Both parties went together to the office of Mr. Dickinson, attorney for Thompson & Binns, and Dempster executed the judgment note, which was made payable at once. Dempster told Thompson that he was about being sued, or expected to be sued, for some accounts. Thompson testified that, being afraid that Dempster would confess judgment to his father or some one else, he (Thompson) took the judgment note in order to get ahead of any such judgment, and instructed his attorney to issue execution as soon as suits were brought or judgment obtained against Dempster. Subsequently a judgment was entered in favor of Dempster's

father, and the attorney for Thompson & Binns immediately issued execution on their judgment.

The master further reported that the confession of judgment to Kulmer was for goods previously purchased, at different times, by Dempster, who had given checks for these purchases. The last two checks having been returned protested, Kulmer went to Chester, saw Mr. Washabaugh, his attorney, and was informed by the latter that Dempster was in an embarrassed condition; that many of his checks and drafts had been protested lately, and that he had been undergoing a crisis in his business affairs, but, if allowed an opportunity, would pay the claim. On behalf of Kulmer, Washabaugh then obtained the judgment note from Dempster, upon the understanding that it was to remain in Washabaugh's hands so long as $50 a week were paid. At this time Washabaugh knew that Dempster had been frequently sued, and that about a week previous judgments had been obtained and executions issued against him for about $1,400, which, however, had been paid.

The master also reported that it was true that Dempster made statements to Mr. Thompson and Mr. Kulmer, asserting his solvency, but that these statements should not have deceived them, as Mr. Thompson was perfectly competent to form an opinion as to the value of Dempster's stock, and Mr. Kulmer's counsel had full knowledge of Dempster's embarrassed condition.

The master was of opinion that the testimony showed that these execution creditors had reasonable cause to believe Dempster insolvent when they procured the judgment notes from him, (citing *Dutcher* v. *Wright*, 4 Otto, 557,) and further said: "Counsel for these execution creditors seemed to rely upon the recent case of *Grant* v. *The Bank*, 7 Otto, 80, as relaxing the rule as to preferences and knowledge on the part of the creditor of the insolvency of the debtor at the time of taking a security, and argued that the decision in that case overruled the leading cases on the subject cited by counsel for the assignee in bankruptcy; but upon a careful examination

v1,no.6—26

of the case referred to the master is unable to see its application to the present case."

With regard to the executions which were issued between the date of the Thompson & Binns and Kulmer executions and the filing of the petition in bankrupcy the master reported as follows: "It was argued by counsel for the several adverse executions heretofore referred to that if it should be held that the executions of Kulmer and Thompson & Binns were void under the bankrupt law these later executions should be paid out of the fund in preference to the assignee in bankruptcy. A number of cases were cited by counsel for and against the proposition. *In re Steel,* 16 N. B. R. 105, and *In re Biesenthal,* 15 N. B. R. 228, were relied upon by counsel for the assignee; and *Stover* v. *Haynes,* 18 N. B. R. 354; *Shelley* v. *Elliston,* 18 N. B. R. 375; *In re Hull,* 18 N. B. R. 4, and *In re Gold Mountain Mining Co.* 15 N. B. R. 545, by the counsel for the adverse creditors. These authorities are somewhat conflicting, but in the opinion of the master the question should be determined by the amount of the preferred execution and the value of the property levied upon. The aggregate amount of the Kulmer and Thompson & Binns executions were nearly $1,200, while the value of the goods levied on * * * was about $900. * * * Although the last executions were not in fraud of the bankrupt law, it is not the province of that law to put such creditors in a better condition than they would have occupied if such law had not existed, or been invoked; and, as they would have taken nothing if the first two executions had remained unimpeached, it cannot be that they should be paid out of a fund realized from the sale of property which, when levied upon by the later executions, was more than absorbed by the prior executions."

For these reasons the master reported that the fund in the registry of the court should be paid to the assignee in bankruptcy. The cause was heard upon exceptions to this report.

*Joseph J. Broadhurst,* for assignee.

*George L. Crawford,* for Thompson & Binns.

*E. Cooper Shapley,* for Kulmer.

*Alfred Driver,* for subsequent execution creditors.

BUTLER, J. An earnest argument was made against the master's finding that the execution creditors, Gotlieb Kulmer and Thompson & Binns, had reasonable cause to believe Mr. Dempster insolvent when the judgment notes were given. It has not convinced us, however, that the master is wrong.

The law is well settled. *Grant* v. *The Bank,* 7 Otto, 80, contains nothing new. The creditor must have such knowledge of facts, to defeat a preference, as are calculated to produce reasonable belief of the debtor's insolvency. It is not sufficient that he have cause to *suspect,* simply. As is said in *Grant* v. *The Bank, dicta* to the contrary are not wanting. But the rule, as above stated, conforms to the language of the statute, and to every decision in which the question was involved. What facts are necessary to produce the belief must be determined in each particular case. No rule on the subject has been or can be established. To some minds the facts found, and adverted to by the judge, in *Grant* v. *The Bank,* would have been sufficient, and, if they had satisfied the circuit court, it is quite probable the final result in that case would have been otherwise.

In the case before us it would be difficult, we think, for an unbiased mind to read the testimony respecting the information possessed by Messrs. Kulmer, and Thompson & Binns, at the time their notes were given, and avoid the conclusion that each of them, directly, or through their counsel, had knowledge calculated to produce a reasonable belief that Mr. Dempster was unable to meet his business obligations as they matured. And this inability constituted insolvency. What they may have supposed him able to do with time to nurse his affairs is unimportant. To each of them he had recently given checks repeatedly, without having funds to meet them. They knew that his creditors were pressing; that he was frequently sued, and was seriously embarrassed, Mr. Dickinson, attorney for Thompson & Binns, testifying that a "multitude of suits" had been instituted against him, "several during the previous week," and that he (the witness) was afraid the father would get judgment and sweep everything away. It is not very important that Mr. Dempster was able to arrange

these suits. The fact remains that he was not able to meet his obligations as they matured, and that Kulmer and Thompson & Binns knew it. He was staggering on, under the burden of his debts, endeavoring to procure time, and hoping to get through, but he was manifestly insolvent, and must have so appeared to all familiar with the facts referred to. His representations made to creditors, under the circumstances, were entitled to little credit, and receive little. Neither Messrs. Kulmer, nor Thompson & Binns, believed that "he had abundant means to pay all his debts," if then pushed; otherwise they would not have threatened suit, and pressed for judgments as they did. The exceptions filed by these creditors must therefore be dismissed.

We also agree with the master respecting the claims of the subsequent execution creditors. Without the intervention of the assignee, it is clear, they could get nothing. The benefit of the intervention is for the general creditors. If it were not, the assignee should withdraw; and, if he did not, the court should dismiss his bill. Why should he interfere, at the expense of the state, to confer preference on these subsequent executions? And why should equity aid him in doing so, if he desired? In the distribution these executions will receive a dividend; to give them more would be most unjust. The levy made subject to the prior executions was of no value. It would not have realized a farthing. In principle the claims of these creditors cannot be distinguished from that made in *Reed* v. *McIntyre*, 8 Otto, 513.

A decree must be prepared dismissing all the exceptions, and confirming the report.